UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| Árpád Széchényi, | : | **22 Civ. 4692** |
| Plaintiff, | : |  |
| - against - | : | **COMPLAINT AND JURY DEMAND** |
| Epic Pharma, LLC, | : | **JURY TRIAL DEMANDED** |
| Defendant. | : |  |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NATURE OF THE ACTION

1.      This is a case about an employer that unlawfully and willfully failed to pay wages, bonuses and other monies/compensation due and owing to an employee under an agreement, in violation of the New York State Labor Law and the common law.

2.      The causes of action in this lawsuit include: (a) failure to pay wages in violation of the New York State Labor Law (the "Labor Law" or "NYLL"); (b) breach of contract; (c) promissory estoppel; (d) unjust enrichment; and (e) quantum meruit.

## THE PARTIES, JURISDICTION AND VENUE

3.      Plaintiff Árpád Széchényi ("Plaintiff") is an adult residing in New Jersey.

4.      Epic Pharma, LLC ("Defendant" or "Epic") is a pharmaceutical company and "foreign limited liability company" incorporated under the laws of the State of Delaware, with a principal place of business in Queens, New York.

5.      The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

6.      This Court has jurisdiction over Plaintiff's claims based on diversity of

citizenship, *see* 28 U.S.C. § 1332.

7.      This Court has personal jurisdiction over Defendant.

8.      Venue is proper in this district pursuant to federal law, including 28 U.S.C. §

1391.

## STATEMENT OF FACTS

### SECTION I

### OCTOBER 2018 DOCUMENT

9.      Plaintiff has worked in the pharmaceutical industry for more than ten (10) years.

10.     In 2018, Plaintiff was recruited by Defendant for the position of President and

Chief Operating Officer of Epic.

11.     At that time, Plaintiff was employed by another pharmaceutical company.

12.     On or about October 9, 2018, Defendant sent Plaintiff a document entitled

Summary of the Offering (the "October Document").

13.     The October Document provided for a compensation package for Plaintiff,

including without limitation the following:

(i)      "A base salary of $350,000 annually";

(ii)     "Short-term Incentive (STI): 50% of base salary"; and

(iii)    "Performance based compensation: 25% of the management bonus pool.
         The management bonus pool is comprised of 20% of incremental EBIDTA
         achieved during the calendar year. For example if the 2018 actual
         EBITDA is $15 million, and the 2019 achieved EBITDA is $25 million.
         The management bonus pool would be ($25-$15 million) *20%=$2
         million. Your share of the bonus would be $500,000. Bonus can be cash,
         or company stocks or a combination of both."

-2-

14.     The term "EBITDA" means earnings before interest, taxes, depreciation, and amortization.

15.     Defendant drafted the October Document.

16.     On or about October 12, 2018, Plaintiff advised Defendant in writing that, regarding the October Document, "The terms are acceptable."

**SECTION II**

**NOVEMBER 2018 DOCUMENT**

17.     On or about November 6, 2018, Defendant sent Plaintiff a signed letter (with exhibits) stating it was extending him an "offer of employment" (the "November Document").

18.     The November Document incorporated compensation listed in the October Document, including without limitation:

(i)     "A base salary of $350,000 annually";

(ii)    "Short-term Incentive (STI): 50% of base salary"; and

(iii)   "Performance based compensation: 25% of the management bonus pool. The management bonus pool will be set up in 2019. Bonus can be cash, or company stocks or a combination of both."

19.     Accordingly, the November Document provided for at least the same compensation level as the October Document, and also provided additional compensation and benefits.

20.     The Short-term Incentive in the October Document and November Document is referred to herein as "STI."

21.     The "Performance based compensation" in the October Document and November Document is referred to herein as a "Success Bonus."

22.     Accordingly, the November Document provided at least the same STI as the October Document.

23.     Accordingly, the November Document provided at least the same Success Bonus as the October Document, *i.e.*, 25% of the management bonus pool.

24.     Defendant repeatedly advised and assured Plaintiff that, under the November Document, the management bonus pool would be calculated according to the formula set forth in the October Document.

25.     The parties intended that the management bonus pool would be calculated according to the formula set forth in the October Document.

26.     In addition, the November Document also provided for certain additional payments to Plaintiff, relating to separation of employment, specifically:

> "If the employment terminates ... by the Executive with Good Reason, the Executive shall be entitled to a lump sum payment consisting of any unpaid annual bonus of any completed fiscal year, a pro-rated annual bonus for the fiscal year in which termination occurs, base salary and health benefits equivalent to three months of employment, and any accrued obligations (expense report)."

27.     The November Document defined "Good Reason" as follows:

> "'With Good Reason' shall mean any material reduction in the Executive's duties or responsibilities, a material reduction in compensation opportunity (base, bonus, success bonus), or the failure of the Company to pay any compensation owing to the Executive."

28.     The October Document and November Document did not condition any of the compensation or separation payments thereunder on the execution of a release of claims by

Plaintiff.

29.     Defendant drafted the November Document.

30.     On or about November 7, 2018, Plaintiff signed the November Document.

31.     Plaintiff, in signing the November Document, reasonably relied on the terms of the October Document and Defendant's promises, representations, and statements to Plaintiff.

32.     The parties entered into a binding contract (the "Agreement").

33.     The terms of the Agreement are set forth in the October Document and November Document.

### SECTION III

### WHILE PLAINTIFF PERFORMED WELL, EPIC'S ACTUAL RESULTS WERE SIGNIFICANTLY UNDER-REPORTED THROUGH ACCOUNTING MANEUVERS

**A.     Plaintiff Performed Well**

34.     In February 2019, Plaintiff assumed the position of President and COO of Epic.

35.     Plaintiff performed his obligations under the Agreement and performed well.

36.     Prior to Plaintiff's employment, Epic had incurred millions of dollars in losses and was in jeopardy of going out of business.

37.     After Plaintiff joined Epic, and under Plaintiff's leadership, Epic achieved a significant turnaround in its business and Epic acknowledged Plaintiff's outstanding job performance.

38.     For example, Epic's sales more than doubled and Epic's EBITDA and Net Income increased in each calendar year of 2019, 2020 and 2021.

39.     For example, Epic exceeded the profitability targets set by its parent company and achieved millions of dollars in profits.

40.     For example, in December 2021, Epic advised its Board words to the effect of that "Epic has been out-growing the market in the last years" by a wide margin, and that "Epic's Sales have grown fast, Net Income even faster."

41.     Epic gave Plaintiff a performance evaluation with the highest possible rating and credited Plaintiff's leadership and initiatives for the successful turnaround of its business.

42.     Plaintiff's accomplishments at Epic were particularly significant, given that during his employment, revenues in the generic pharmaceutical market decreased industry-wide.

**B.      Epic's Reported Results Were Deflated By Its Accounting Maneuvers**

43.     In each of the years 2019, 2020 and 2021, Defendant engaged in certain accounting and financial practices (the "Accounting Maneuvers").

44.     Defendant's Accounting Maneuvers included, among other items, recognizing in 2019, 2020 and/or 2021 millions of dollars in expenses that had been incurred (or should have been accrued) by Defendant in years prior to Plaintiff's employment with Defendant.

45.     Such expenses included, without limitation:  (a) unrecognized Medicaid accruals; (b) debit memo adjustments; (c) impairment charges and agreement amortization charges; (d) bad debt charges to clean up long-delinquent positions; (e) catch-up accruals for government pricing, and increasing accruals for inventory, trade penalties, and other accruals.

46.     Defendant's Accounting Maneuvers also included, among other items, deferring the reporting of millions of dollars in revenue realized in 2019, 2020 and/or 2021.

47.     Such profits included, without limitation, approximately $11 million in net revenue on sales of one specific product in the third and fourth quarters of 2021.

48.     Plaintiff opposed, objected to and complained about Defendant's Accounting Maneuvers.

49.     However, Defendant continued to engage in the Accounting Maneuvers.

50.     As a result of Epic's Accounting Maneuvers, Defendant calculated and reported EBITDA for 2019, 2020 and 2021 in amounts well below Epic's actual EBITDA.

51.     For purposes of calculating Plaintiff's earned Success Bonus with Epic, Epic's reported EBITDA should be adjusted to remove the Accounting Maneuvers, because, among other items: (a) Plaintiff's Success Bonus is "performance based compensation" and the amount of Plaintiff's earned Success Bonus is based on Epic's *actual* EBITDA, not Epic's under-reported EBITDA resulting from Epic's Accounting Maneuvers; (b) Epic repeatedly advised and represented to Plaintiff that any Accounting Maneuvers would not impact the calculation of his earned Success Bonuses; and/or (c) Epic's Accounting Maneuvers are at least highly suspect and questionable, if not improper and impermissible.

52.     When Epic's reported EBITDA is adjusted to remove the impact of the Accounting Maneuvers, Epic's actual EBITDA for 2019, 2020 and 2021 is significantly larger, and the incremental increase in EBITDA from year to year is also significantly larger.

**SECTION IV**

**PLAINTIFF INDISPUTABLY EARNED SUCCESS BONUSES IN EACH YEAR, AND WHEN EPIC'S REPORTED FINANCIALS ARE ADJUSTED TO REMOVE THE ACCOUNTING MANEUVERS, THE EARNED BONUSES ARE MUCH LARGER**

53.     As discussed more fully below, pursuant to the Agreement, Plaintiff earned Success Bonuses with Epic for 2019, 2020 and 2021.

**A.     Plaintiff Earned A Success Bonus With Epic For 2019**

54.     Epic's EBITDA in 2019 was larger than Epic's EBITDA for 2018.

55.     Accordingly, Plaintiff achieved an incremental increase in Epic's EBITDA for the calendar year 2019 as compared to the calendar year 2018.

56.     According to Epic's Finance Department, Epic's EBITDA for 2018 reflected a *loss* of **-$5,198,000**.

57.     According to Epic's Finance department, Epic's EBITDA for 2019 was **$13,812,000**.

58.     Therefore, based on the data reported by Epic's Finance department, the incremental increase in Epic's EBITDA from 2018 to 2019 was approximately **$19,010,000** (*i.e.*, $13,812,000 + $5,198,000).

59.     Based on that data, under the Agreement, Epic's management bonus pool for 2019 would be **$3,802,000** (*i.e.*, 20% of $19,010,000) and Plaintiff's earned Success Bonus with Epic for that year would be **$950,500** (*i.e.*, 25% of $3,802,000).

60.     When Epic's reported EBITDA is adjusted to remove the impact of the Accounting Maneuvers, and remove the out-of-period expenses included in Epic's financial statements and/or recognize revenue for 2019 that Epic deferred through Accounting Maneuvers,

the amount of the earned 2019 Success Bonus substantially increases:

    (a)    Epic's actual EBITDA in 2018 would be a loss of **-$9,198,000**;

    (b)    Epic's actual EBITDA in 2019 would be at least **$17,312,000**;

    (c)    The incremental increase in Epic's EBITDA from the prior year would be at least **$26,510,000** (*i.e.*, $17,312,000 + $9,198,000);

    (d)    Epic's management bonus pool would be at least **$5,302,000** (*i.e.*, 20% of $26,510,000); and

    (e)    Plaintiff's earned Success Bonus for 2019 with Epic would be at least **$1,325,500** (*i.e.*, 25% of $5,302,000).

61.    By this lawsuit, Plaintiff seeks, among other items, a Success Bonus with Epic for 2019 in the amount of at least **$1,325,500**.

62.    Defendant unlawfully failed to pay Plaintiff his earned Success Bonus with Epic for 2019, in breach of the Agreement and in violation of Plaintiff's legal rights.

**B.**    **Plaintiff Earned A Success Bonus With Epic For 2020**

63.    Epic's EBITDA in 2020 was larger than Epic's EBITDA for 2019.

64.    Accordingly, Plaintiff achieved an incremental increase in EBITDA for the calendar year 2020 as compared to the calendar year 2019.

65.    As noted above, according to Epic's Finance department, Epic's EBITDA for 2019 was **$13,812,000**.

66.    According to Epic's Finance department, Epic's EBITDA for 2020 was **$14,791,000**.

67.    Based on that data, the incremental increase in Epic's EBITDA over the prior calendar year was approximately **$979,000** (*i.e.*, $14,791,000 - $13,812,000).

68.     Based on that data, under the Agreement, Epic's management bonus pool for 2020 would be **$195,800** (*i.e.*, 20% of $979,000) and Plaintiff's earned Success Bonus with Epic for that year would be **$48,950** (*i.e.*, 25% of $195,800).

69.     When Epic's reported EBITDA is adjusted to remove the impact of the Accounting Maneuvers, and remove the out-of-period expenses included in Epic's financial statements and/or recognize revenue for 2020 that Epic deferred through Accounting Maneuvers, the amount of the earned 2020 Success Bonus substantially increases:

(a)     Epic's actual EBITDA in 2020 would be at least **$28,091,000**;

(b)     The incremental increase in Epic's EBITDA from the prior year would be at least **$10,779,000** (*i.e.*, $28,091,000 - $17,312,000);

(c)     Epic's management bonus pool would be at least **$2,155,800** (20% of $10,779,000); and

(d)     Plaintiff's earned Success Bonus for 2020 with Epic would be at least **$538,950** (*i.e.*, 25% of $2,155,800).

70.     By this lawsuit, Plaintiff seeks, among other items, a Success Bonus with Epic for 2020 in the amount of at least **$538,950**.

71.     Defendant unlawfully failed to pay Plaintiff his earned Success Bonus with Epic for 2020, in breach of the Agreement and in violation of Plaintiff's legal rights.

**C.     Plaintiff Earned A Success Bonus With Epic For 2021**

72.     Epic's EBITDA in 2021 was larger than Epic's EBITDA for 2020.

73.     Accordingly, Plaintiff achieved an incremental increase in EBITDA for the calendar year 2021 as compared to the calendar year 2020.

74.     As noted above, according to Epic's Finance department, Epic's EBITDA for 2020 was **$14,791,000**.

75.     According to Epic's Finance department, Epic's EBITDA for 2021 was **$15,811,000**.

76.     Based on that data, the incremental increase in Epic's EBITDA over the prior calendar year was approximately **$1,020,000** (*i.e.,* $15,811,000 - $14,791,000).

77.     Based on that data, under the Agreement, Epic's management bonus pool for 2021 would be **$204,000** (*i.e.*, 20% of $1,020,000) and Plaintiff's earned Success Bonus with Epic for that year would be **$51,000** (*i.e.*, 25% of $204,000).

78.     When Epic's reported EBITDA is adjusted to remove the impact of the Accounting Maneuvers, and remove the out-of-period expenses included in Epic's financial statements and/or recognize revenue for 2021 that Epic deferred through Accounting Maneuvers, the amount of the earned 2021 Success Bonus substantially increases:

      (a)    Epic's actual EBITDA in 2021 would be at least **$39,811,000**;

      (b)    The incremental increase in Epic's EBITDA from the prior year would be at least **$11,720,000** (*i.e.*, $39,811,000 - $28,091,000);

      (c)    Epic's management bonus pool would be at least **$2,344,000** (*i.e.*, 20% of $11,720,000); and

      (d)    Plaintiff's earned Success Bonus for 2021 with Epic would be at least **$586,000** (*i.e.*, 25% of $2,344,000).

79.     By this lawsuit, Plaintiff seeks, among other items, a Success Bonus with Epic for 2021 in the amount of at least **$586,000**.

80.     Defendant unlawfully failed to pay Plaintiff his earned Success Bonus with Epic for 2021, in breach of the Agreement and in violation of Plaintiff's legal rights.

**E.     Defendant Unlawfully Refused To Pay Plaintiff His Earned Success Bonuses, Which Bonuses Are Much Larger When EBITDA Is Properly Adjusted**

81.     Based on Defendant's reported data, the total amount of Plaintiff's earned Success Bonuses with Epic, which Epic unlawfully failed to pay, is at least **$1,050,450** (*i.e.*, the sum of Success Bonuses with Epic for 2019, 2020 and 2021 in the amounts of $950,500, $48,950, and $51,000).

82.     When Epic's reported EBITDA is adjusted to remove the impact of the Accounting Maneuvers, and remove the out-of-period expenses included in its financial statements and/or recognize revenue it deferred through Accounting Maneuvers, the amount of Plaintiff's earned Success Bonuses for 2019 to 2021, with Epic, which Epic unlawfully failed to pay, is at least **$2,450,450** (*i.e.*, based on adjusted EBITDA, the sum of Success Bonuses with Epic for 2019, 2020 and 2021 in the amounts of $1,325,500, $538,950, and $586,000).

83.     By this lawsuit, Plaintiff seeks to recover unpaid Success Bonuses of at least **$2,450,450**, as well as all other recoverable damages and relief on Plaintiff's claims.

**SECTION V**

**PLAINTIFF EARNED STI FOR 2021**

84.     Plaintiff's base salary for 2021 was approximately **$378,526**.

85.     Pursuant to the Agreement, Plaintiff earned STI for 2021 in the amount of at least **$189,263** (*i.e.*, ½ of Plaintiff's base salary).

-12-

86.     However, Defendant unlawfully failed to pay Plaintiff his STI for 2021, in breach of the Agreement and in violation of Plaintiff's legal rights.

87.     By this lawsuit, Plaintiff seeks to recover his STI for 2021 of at least **$189,263**, as well as all other recoverable damages and relief on Plaintiff's claims.

## SECTION VI

## IN JANUARY 2022, PLAINTIFF RESIGNED WITH GOOD REASON AND WAS THEREFORE ENTITLED TO CERTAIN ADDITIONAL PAYMENTS

88.     On January 14, 2022, Plaintiff resigned from his employment with Defendant, effective January 28, 2022.

89.     On January 14, 2022, Plaintiff submitted a letter of resignation to Defendant, stating:

> "It is with great sadness that I have to inform you of my resignation effective January 28th, 2022. The resignation is 'With Good Reason' (employment offer dated Nov 6th, 2018 and fully executed Nov 7th) on the grounds that Company has not paid my success bonus (management bonus pool) due for 2019 and 2020, and materially reduced my compensation opportunity for 2019, 2020, and 2021 due to accounting which lessened the profit baseline for calculating the success bonus."

90.     In addition, as of January 14, 2022, Defendant had failed to pay Plaintiff his STI for 2021 and his Success Bonus for 2021.

91.     As noted above, under the Agreement, "'With Good Reason' shall mean any material reduction in the Executive's duties or responsibilities, a material reduction in compensation opportunity (base, bonus, success bonus), or the failure of the Company to pay any compensation owing to the Executive."

92.     Here, Plaintiff resigned "With Good Reason" as defined in the Agreement.

-13-

93.     Plaintiff repeatedly requested and/or demanded payment of his earned Success Bonuses for 2019, 2020 and 2021 and his STI for 2021.

94.     Defendant unlawfully failed to pay Plaintiff his earned Success Bonuses for 2019, 2020 and 2021, in breach of the Agreement and in violation of Plaintiff's legal rights.

95.     Defendant also unlawfully failed to pay Plaintiff his STI for 2021, in breach of the Agreement and in violation of Plaintiff's legal rights.

96.     Defendant caused Plaintiff to suffer "a material reduction in compensation opportunity (base, bonus, success bonus)" by, among other items: (a) non-payment of earned Success Bonuses and STI due and owing to Plaintiff; and (b) Accounting Maneuvers that artificially reduced the EBITDA reported by Defendant.

97.     Defendant failed to pay earned wages, bonuses and other monies/compensation due and owing to Plaintiff.

98.     As noted above, under the Agreement, "If the employment terminates ... by the Executive with Good Reason, the Executive shall be entitled to a lump sum payment consisting of any unpaid annual bonus of any completed fiscal year, a pro-rated annual bonus for the fiscal year in which termination occurs, base salary and health benefits equivalent to three months of employment, and any accrued obligations (expense report)."

99.     In addition to the monies discussed above in Sections IV and V, because Plaintiff resigned "with Good Reason," Plaintiff was also entitled to receive additional monies upon his resignation, including without limitation:

(a)     *First*, Plaintiff was entitled to receive a pro-rated STI for 2022, in an amount of at least $15,772;

-14-

(b)     *Second*, Plaintiff was entitled to receive a pro-rated Success Bonus for 2022, in an amount to be determined;

(c)     *Third*, Plaintiff was entitled to receive a lump sum payment of three months' base salary, in an amount of at least $94,631; and

(d)     *Fourth*, Plaintiff was entitled to receive expense reimbursement, in an amount of at least $2,324.44.

100.    Plaintiff was also entitled to receive a lump sum payment of three months' health insurance coverage, and Defendant provided Plaintiff with three months' insurance coverage.

## SECTION VII

## SUMMARY OF AMOUNTS DUE AND OWING TO PLAINTIFF

101.    Accordingly, pursuant to the Agreement, at the time of Plaintiff's resignation from Epic, Defendant owed Plaintiff, among other items, at least the following amounts:

(a)     At least $1,325,500 as and for his Success Bonus with Epic for 2019;

(b)     At least $538,950 as and for his Success Bonus with Epic for 2020;

(c)     At least $586,000 as and for his Success Bonus with Epic for 2021;

(d)     At least $189,263 as and for his STI for 2021;

(e)     At least $15,772 as and for a pro-rated STI for 2022;

(f)     A pro-rated Success Bonus for 2022, in an amount to be determined;

(g)     At least $94,631 as and for three months' base salary; and

(h)     At least $2,324.44 as and for expense reimbursement.

The above items in this Paragraph are referred to herein as the "Unpaid Wages."

102.    Based on the above, the Unpaid Wages is an amount of at least **$2,752,440.44** *plus* a pro-rated Success Bonus for 2022, in an amount to be determined.

103.   Plaintiff demanded payment of the Unpaid Wages due and owing to him.

## SECTION VIII

## EPIC UNLAWFULLY FAILED TO PAY THE UNPAID WAGES TO PLAINTIFF

104.   Defendant unlawfully failed to pay the Unpaid Wages to Plaintiff.

105.   On or about January 17, 2022, Defendant issued a letter to Plaintiff, in response to Plaintiff's letter of January 14, 2022, in which Defendant stated:

> "With this letter, the company rejects your claim of a 'good reason' resignation. We do, however, accept your notice of voluntary resignation, with your last working day being January 28, 2022 or such earlier date as the company may determine."

106.   On January 28, 2022, the Company sent a subsequent letter to Plaintiff stating, among other items, that "You will receive a proposed Separation Agreement via email in the coming days."

107.   On or about February 4, 2022, Defendant sent to Plaintiff a proposed Separation, Waiver And Release Agreement ("Release Agreement"), asking him to sign a release of claims in exchange for payment of less than one-tenth of the Unpaid Wages due and owing to him.

108.   Plaintiff declined to sign the Release Agreement and reiterated his demand for payment of the Unpaid Wages.

109.   Defendant unlawfully failed to pay the Unpaid Wages to Plaintiff, in breach of the Agreement and in violation of Plaintiff's legal rights.

110.   Defendant knew or should have known that it was legally and statutorily required to pay to Plaintiff his wages, including the Unpaid Wages.

-16-

111.    Defendant knew or should have known that it was unlawful to condition payment of any Unpaid Wages upon execution of a release.

112.    Defendant's unlawful failure to pay Plaintiff his wages, including the Unpaid Wages, violated Plaintiff's rights under the Agreement and constituted a breach of the Agreement, violated the Labor Law, and was intentional and willful within the meaning of the Labor Law.

113.    There is a sum accrued, due and owing by Defendant to Plaintiff as and for unpaid wages/bonuses, which amounts have never been paid by Defendant to Plaintiff, despite repeated requests by Plaintiff for such wages/bonuses.

114.    As noted above, when Defendant's reported EBITDA is adjusted to remove the impact of the Accounting Maneuvers, and remove the out-of-period expenses included in its financial statements and/or recognize revenue it deferred through Accounting Maneuvers, Defendant's actual EBITDA in each of the years 2019, 2020 and 2021 was larger than the amounts reported by Defendant, and Plaintiff's earned Success Bonuses are larger than those calculated based upon Defendant's reported EBITDA.

115.    The amount of Unpaid Wages is subject to increase following discovery of the full extent of Defendant's Accounting Maneuvers.

116.    Plaintiff has been damaged because of Defendant's unlawful conduct, and is entitled to a judgment against Defendant and an award of damages and other relief on his claims, in an amount to be determined, together with interest thereon.

117.    To date, Defendant has unlawfully failed to pay the Unpaid Wages to Plaintiff.

## COUNT ONE
### (New York State Labor Law)

118.     Plaintiff repeats and realleges every allegation in all preceding paragraphs of this Complaint with the same force and effect as though fully set forth herein.

119.     This Count is brought under the New York State Labor Law ("Labor Law" or "NYLL").

120.     At all relevant times, Plaintiff was an "employee" of Defendant within the meaning of the Labor Law and was entitled to the protections of the Labor Law and its supporting regulations. *See, e.g.*, Labor Law § 190(2).

121.     At all relevant times, Defendant was an "employer" of Plaintiff within the meaning of the Labor Law, and was and is required to comply with the Labor Law and its supporting regulations. *See, e.g.*, Labor Law § 190(3).

122.     Plaintiff's wages/compensation with Defendant included, among other items: (a) base salary; (b) Short-term Incentive bonuses (also referred to herein as "STI"); (c) Performance based compensation (also referred to herein as "Success Bonuses"); (d) severance pay; and (e) expense reimbursement.

123.     Plaintiff's wages, bonuses and other compensation and benefits with Defendant are "wages" within the meaning of the Labor Law. *See, e.g.*, Labor Law § 190(1).

124.     Defendant has failed to pay Plaintiff wages due and owing to him, including without limitation the Unpaid Wages as defined herein (which amount is subject to increase following discovery regarding the full extent of Defendant's Accounting Maneuvers).

125.     Defendant has unlawfully failed to pay Plaintiff wages due and owing to him, in violation of the Labor Law.  *See, e.g.*, Labor Law §§ 193, 198.

126.     Defendant has violated the Labor Law.  *See, e.g.*, Labor Law §§ 193, 198.

127.     Defendant has willfully and without a good faith basis violated the Labor Law.

128.     As a result of Defendant's violation of the Labor Law, Plaintiff is entitled to recover, without limitation: (a) all unpaid wages; (b) 100% liquidated damages on the amount of unpaid wages; (c) lost interest at the rate of at least 9%, which amount continues to accrue; and (d) attorneys' fees and costs, which amount continues to accrue.

129.     Plaintiff has been damaged, and is entitled to a judgment against Defendant, in an amount to be determined, together with interest thereon, to compensate Plaintiff for Defendant's unlawful failure to pay Plaintiff wages due and owing to him, Defendant's unlawful conduct, and Defendant's violation of the Labor Law.

## COUNT TWO
### (Breach of Contract)

130.     Plaintiff repeats and realleges every allegation in all preceding paragraphs of this Complaint with the same force and effect as though fully set forth herein.

131.     Plaintiff had a contract with Defendant, referred to above as the Agreement.

132.     Pursuant to Plaintiff's contract with Defendant, Plaintiff earned wages, bonuses and other compensation and benefits and Defendant was required to pay same to him.

133.     Plaintiff has performed his contractual obligations to Defendant.

134.     Defendant unlawfully and willfully failed to pay Plaintiff wages, bonuses and other monies/compensation due and owing to him, in breach of contract.

135.    Defendant breached its contractual obligations to Plaintiff by failing and refusing to pay Plaintiff the earned wages, bonuses and other monies/compensation due and owing to him, including without limitation the Unpaid Wages as defined herein (which amount is subject to increase following discovery regarding the full extent of Defendant's Accounting Maneuvers).

136.    As a result of Defendant's breach of contract, Plaintiff is entitled to recover, without limitation: (a) all unpaid wages, bonuses and other monies/compensation due and owing to him; (b) lost interest at the rate of 9%, which amount continues to accrue; and (c) costs, which amount continues to accrue.

137.    Plaintiff has been damaged, and is entitled to a judgment against Defendant, in an amount to be determined, together with interest thereon, to compensate Plaintiff for Defendant's unlawful conduct.

<u>**COUNT THREE**</u>
**(Promissory Estoppel)**

138.    Plaintiff repeats and realleges every allegation in all preceding paragraphs of this Complaint with the same force and effect as though fully set forth herein.

139.    The elements of a claim for promissory estoppel are: (a) a clear and unambiguous promise; (b) reasonable and foreseeable reliance on that promise; and (c) injury to the relying party as a result of the reliance.

140.    Defendant made clear and unambiguous promises to Plaintiff, including without limitation, promises regarding his wages and compensation with Defendant, in order to induce Plaintiff to leave other employment and join Defendant.

141.   Defendant acted or comported itself wrongfully or negligently, inducing reliance by Plaintiff who was entitled to rely and who changed his position to his detriment or prejudice.

142.   Plaintiff reasonably, foreseeably and justifiably relied on Defendant's promises.

143.   In reliance on Defendant's promises, Plaintiff accepted employment with Defendant and continued his employment with Defendant.

144.   Defendant broke its promises to Plaintiff.

145.   Defendant broke its promises to Plaintiff by, among other items, failing to pay him, without limitation the Unpaid Wages as defined herein (which amount is subject to adjustment following discovery regarding the full extent of Defendant's Accounting Maneuvers).

146.   As a direct and proximate cause of the broken promises by Defendant to Plaintiff, and Plaintiff's justifiable reliance thereon, Defendant has caused Plaintiff to suffer substantial damages.

147.   Plaintiff has been damaged, and is entitled to a judgment against Defendant, in an amount to be determined, together with interest thereon.

## COUNT FOUR
### (Unjust Enrichment)

148.   Plaintiff repeats and realleges every allegation in all preceding paragraphs of this Complaint with the same force and effect as though fully set forth herein.

149.   The elements of a claim of unjust enrichment are that: (a) the other party was enriched; (b) at that party's expense; and (c) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered.

150.    Defendant has been unjustly enriched and benefitted at Plaintiff's expense by, among other items, failing to pay Plaintiff the Unpaid Wages as defined herein (which amount is subject to adjustment following discovery regarding the full extent of Defendant's Accounting Maneuvers).

151.    The circumstances are such that equity and good conscience require Defendant to make full restitution to Plaintiff.

152.    Plaintiff has been damaged, and is entitled to a judgment against Defendant, in an amount to be determined, together with interest thereon, to compensate Plaintiff for Defendant's unjust enrichment.

## COUNT FIVE
### (Quantum Meruit)

153.    Plaintiff repeats and realleges every allegation in all preceding paragraphs of this Complaint with the same force and effect as though fully set forth herein.

154.    The elements of quantum meruit are as follows: (1) the Plaintiff's performance of services in good faith; (2) acceptance of those services by the other party; and (3) an expectation of compensation and proof of the reasonable value of services.

155.    Plaintiff performed services in good faith, Defendant accepted those services, and Plaintiff expected to be paid compensation for those services.

156.    The amount that Defendant failed to pay Plaintiff for those services includes, without limitation the Unpaid Wages as defined herein (which amount is subject to adjustment following discovery regarding the full extent of Defendant's Accounting Maneuvers).

157.    Plaintiff has been damaged, and is entitled to a judgment against Defendant, in an amount to be determined, together with interest thereon, to compensate Plaintiff in quantum meruit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment in favor of Plaintiff against Defendant on all Counts, including as follows:

A.    Award Plaintiff damages under the Labor Law, according to proof, representing the Unpaid Wages, unpaid wages/bonuses and other applicable statutory damages (*see*, *e.g.,* N.Y. Lab. L. §§ 191, 198);

B.    Award Plaintiff damages, including without limitation actual damages, compensatory damages, and economic damages, according to proof, based on Plaintiff's common law claims for breach of contract, promissory estoppel, unjust enrichment, and quantum meruit;

C.    Award Plaintiff liquidated damages under the Labor Law (*see*, *e.g.,* N.Y. Lab. L. § 198);

D.    Award Plaintiff attorneys' fees under the Labor Law (*see, e.g.,* N.Y. Lab. L. § 198);

E.    Award Plaintiff the costs of the action incurred herein, including any expert fees;

F.    Award Plaintiff pre-judgment and post-judgment interest;

G.    Award Plaintiff a judgment that additionally provides, among other items, that if any amounts awarded under the Labor Law remain unpaid upon the expiration of ninety days following issuance of judgment, or ninety days after expiration of the

time to appeal and no appeal is then pending, whichever is later, the total amount

of judgment shall automatically increase by fifteen percent (*see* N.Y. Lab. L. §

198);

H.      Award Plaintiff all other damages and legal relief provided by applicable law; and

I.      Award Plaintiff such further legal relief as may be necessary and proper.

## **JURY DEMAND**

Plaintiff demands a jury trial for all issues triable.

Dated:  August 9, 2022

                                                    GOLDBERG & FLIEGEL LLP

                                                    /s/ Kenneth A. Goldberg
                                            By:  _____
                                                    Kenneth A. Goldberg
                                                    488 Madison Avenue, #1120
                                                    New York, New York 10022
                                                    (212) 983-1077
                                                    kgoldberg@goldbergfliegel.com
                                                    Attorneys for the Plaintiff